**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CENFIN, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16-CV-9612 |
| ) | Judge Pallmeyer |
| M2 NGAGE GROUP, INC, ) | Magistrate Judge Rowland |
| f/k/a Roomlinx, Inc., ) | |
| Defendant. ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Cenfin, LLC ("Cenfin"), by its attorney, brings its first amended complaint against defendant M2 nGage Group, Inc. ("M2"), f/k/a Roomlinx, Inc., and in support thereof states as follows:

Parties

1. Cenfin is a Delaware limited liability company, with its principal place of business in Chicago, Illinois. Cenfin's sole member is PEAK6 LLC, a Delaware limited liability company, with its principal place of business in Chicago, Illinois. The members of PEAK6 LLC are Matthew Hulsizer and Jennifer Just, who are citizens of Illinois and residents of Cook County.

2. M2 is a Nevada corporation with its principal place of business in Los Angeles, California. On July 28, 2016, M2 amended its articles of incorporation to change its name from Roomlinx, Inc.

Jurisdiction and Venue

3. Subject matter jurisdiction exists over this matter under 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

1

4. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events leading to this claim occurred in this district.

Background

5. Cenfin is in the business of, among other things, commercial lending. Cenfin is also a shareholder in M2.

6. Signalshare Infrastructure, Inc. ("SSI") is a wholly-owned subsidiary of M2.

7. SSI was formed in March 2015 in connection with the "reverse merger" involving the publicly-traded Roomlinx, Inc. (now known as M2) and the privately-held Signal Point Holdings, Corp. M2's 2015 Form 10-K, filed with the Securities and Exchange Commission on August 30, 2016, describes the transaction as follows:

> On March 27, 2015, the Company entered into and completed (the "Closing") a Subsidiary Merger Agreement (the "SMA") by and among the Company, Signal Point Holdings Corp. ("SPHC"), SignalShare Infrastructure, Inc. ("SSI") and RMLX Merger Corp. Upon the terms and conditions of the SMA, the Company's wholly-owned subsidiary RMLX Merger Corp., a Delaware corporation, was merged with and into SPHC, with SPHC and its operating subsidiaries surviving as a wholly-owned subsidiary of the Company (the "Subsidiary Merger"). The existing business of Roomlinx was transferred into a newly-formed, wholly-owned subsidiary named SignalShare Infrastructure Inc. . . . As a result of the Subsidiary Merger, the shareholders of SPHC, a privately-owned Delaware corporation, received an aggregate of approximately 85% of the Fully Diluted (as defined therein) common stock of the Company.

8. On March 24, 2015, Cenfin signed an Amended and Restated Revolving Credit Agreement ("Credit Agreement") with SSI and M2 through which SSI could borrow up to $10 million from Cenfin. M2, as the parent of SSI, provided certain representations and warranties in the Credit Agreement. A copy of the Credit Agreement is attached as Exhibit A.

9. On March 24, 2015, M2 signed a Stock Pledge Agreement in favor of Cenfin in connection with the loan to SSI. A copy of the Stock Pledge Agreement is attached as Exhibit B.

10. Almost immediately after the March 2015 reverse merger, M2 began to suffer significant financial distress. In April 2015, M2 transferred $200,000 from its subsidiary SSI to itself in order to fund M2's ongoing operations. This shortfall was to the detriment of both SSI and its creditor Cenfin, and was made without Cenfin's knowledge or approval.

11. After Cenfin learned of this $200,000 payment from SSI to M2, it demanded that the money be paid back. Cenfin, M2, and SSI entered into the First Amendment To Amended And Restated Revolving Credit And Security Agreement (dated June 30, 2015) ("First Amendment") (Attached as Exhibit C), which, among other things, obligated M2 to repay SSI the $200,000 that M2 had taken in April.

12. M2's financial problems did not abate. In October 2015, Cenfin, M2 and SSI entered into the Second Amendment To Amended And Restated Revolving Credit And Security Agreement (dated October 7, 2015) ("Second Amendment") (Attached as Exhibit D), through which Cenfin agreed to forebear for a certain period of time foreclosing on the loan to SSI, in order to allow M2 time to restructure its business.

13. In addition, M2 and Cenfin entered into a November 19, 2015, Guaranty and Payment Agreement ("Guaranty") (attached as Exhibit E), by which M2 gave to Cenfin a guaranty of a portion of SSI's debt under the Credit Agreement.

14. SSI defaulted on the Credit Agreement. Cenfin foreclosed on SSI's assets and on May 3, 2016, sold those assets to the highest qualified bidder at a public auction.

15. SSI currently owes Cenfin in excess of $2,000,000, not including interest and costs.

16. M2's financial problems continue. On its latest Form 10-K, M2 reported that for the year ending December 31, 2015, M2 had revenues of approximately $10.6 million, and a loss of approximately $81.6 million.

## Count I
## Breach of Guaranty

17. Cenfin incorporates paragraphs 1-16 of this complaint as if fully stated herein.

18. Under the Guaranty, M2 provided a guaranty of SSI's debt to Cenfin. The amount of M2's Guaranty was based on conditions specified in the agreement. Under the Guaranty, Cenfin agreed that SSI could make a $150,000 loan to M2, which M2 would repay by December 15, 2015. M2 also agreed to pay $75,000 to Cenfin by December 15, 2015, which amount would be applied to SSI's outstanding interest and/or principal on the loan. If the $75,000 payment to Cenfin was made by December 15, 2015, and the $150,000 loan was repaid to SSI by that same date, the guaranty amount would be $150,000. Otherwise the guaranty amount would be $1,500,000.

19. M2 did not make the specified payment to Cenfin by December 15, 2015. Further, on information and belief, it did not repay SSI.

20. M2's liability under the Guaranty is $1,500,000.

21. SSI owes Cenfin in excess of $2.0 million.

22. On February 10, 2016, Cenfin sent a demand to M2 for payment of $1,500,000 under the Guaranty. M2 did not make that payment

23. Pursuant to the Guaranty, M2 owes Cenfin $1,500,000, which remains unpaid.

## Count II
## Breach of Contract

24. Cenfin incorporates paragraphs 1-23 of this complaint as if fully stated herein.

25. Under the Credit Agreement as well as its related documents (such as the Stock Pledge Agreement and the First Amendment and Second Amendment), SSI and M2 provided certain

4

representations, warranties, covenants, and commitments. SSI and M2 repeatedly breached these agreements.

### Breach of Obligation Not to Weaken SSI's Financial Position or Prospects

26.     Under Section 5.25 of the Credit Agreement, M2 agreed that it will "take no action which could have the effect of weakening Borrower's financial position or prospects or result in the insolvency of Borrower." In Section 5(h) of the Stock Pledge Agreement, M2 similarly agreed that it is "solvent and shall not take or allow to occur any action that would result in the insolvency of Borrower."[1]

27.     Moreover, Section 2 of the First Amendment specifically barred SSI and M2 from transferring funds from SSI to M2, without Cenfin's approval.

28.     M2 breached these provisions. SSI is insolvent, and indeed has been foreclosed upon. M2 contributed to that insolvency by, among other actions, taking cash from SSI and not timely paying it back. Moreover, in the year prior to the reverse merger, SSI, then known as Roomlinx, incurred a loss of approximately $2.6 million. M2 and its officers recognized that post-merger SSI required infusions of cash to improve its performance. Nonetheless, M2 removed cash from the already-stressed SSI.

### Breach of "Equity Raise Proceeds" Commitment

29.     The First Amendment added a Section 8.17 to the Credit Agreement entitled "Equity Raise Proceeds." Under this provision, M2 and SSI agreed:

> [T]hat, as consideration for Lender's agreement to enter into the First Amendment to this Agreement, Borrower and Parent shall pay (in nonrefundable funds) to Lender, as a reduction first of accrued and unpaid interest and then as reduction in principle amount,

---

[1] "Borrower" is defined in the Credit Agreement, its amendments, and the Stock Pledge Agreement as SSI. M2 is defined in the Credit Agreement and Amendments as "Parent," and in the Stock Pledge Agreement as "Pledgor." Cenfin is defined in the Credit Agreement and Amendments as "Lender," and in the Stock Pledge Agreement as "Secured Party."

> 33% of the gross proceeds received by Parent or Borrower from the sale or issuance of any equity (preferred or common), convertible notes or debentures, or debt (other than ordinary course equipment finding arrangements) until the Obligations are paid in full.

30. M2's Form 8-K, which M2 filed with the Securities and Exchange Commission on February 3, 2016, states that M2 "completed the initial closing of $550,000 of Series B Convertible Preferred Stock ("Preferred Stock") on February 2, 2016."

31. Pursuant to Section 8.17, Cenfin is entitled to 33 percent of the amount raised from M2's sale of the Preferred Stock. M2 has not forward that amount to Cenfin, and therefore has breached the agreement.

### Breach of Warranties Regarding Claims, Litigation and Defaults

32. Under Section 7.4 of the First Amendment and the Second Amendment, M2 and SSI both provide representations and warranties concerning litigation or claims:

> No action, suit, litigation, investigation, or proceeding of or before any arbitrator or governmental authority is pending or, to the knowledge of Borrower or Parent, threatened by or against or affecting Borrower or Parent or against any of their property or assets with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby.

33. Under Section 5.5 of the Credit Agreement, M2 and SSI both represented and warranted that neither was "in default under any agreement to which it is a party, the effect of which will materially adversely affect performance by the Parent or the Borrower of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement or any of the Transaction Documents."

34. Under the Credit Agreement, as well as the First and Second Amendments, the representations and warranties that M2 and SSI provided were continuing   Further, M2 and SSI agreed that Cenfin relied up on these representations and warranties.

35. M2 and SSI's representations and warranties regarding no litigation, claims or defaults were false. In fact, M2 and SSI were the subjects of numerous claims and defaults:

   a. A lawsuit was filed in January 2016 in Massachusetts against M2's subsidiaries Signalshare LLC, and Signal Point Holdings Corp., as well as two individuals. *NFS Leasing, Inc. v. Signalshare, LLC*, No. 16-10130 (D. Mass.). This lawsuit alleges that Signalshare defrauded a supplier. The fraud was allegedly presented to Signalshare in June 2015. To settle the claim, Signalshare signed a note in July 2015 providing large weekly payments to the supplier. This note was guaranteed by Signalshare's parent, Signal Point Holdings Corp., which is owned by M2, as well as two individuals. Signalshare ultimately went into bankruptcy. Signal Point Holdings Corp. settled a cross claim from one of the individual guarantors by paying him $92,000.

   b. M2's subsidiary Signalshare is in default of its payroll tax obligation to the IRS for the first and second quarter of 2015. The amount owed, with interest and penalties, is approximately $673,888. The IRS has placed liens on Signalshare, and has sought to levy certain of its receivables.

   c. El Dorado Offices 2, LP, a landlord, sued M2 and SSI in November 2015, for back rent under a commercial lease. M2 settled the matter in June 2016 for a payment of $125,000.

   d. CLC Networks and Skada Capital filed suit against M2 in Colorado state court. M2 settled the case for $106,528, and finished paying the settlement in December 2015.

7

  e. On October 1, 2015, Signalshare received notice that its lease with Aerial Realty Corp for office space in North Carolina was being terminated due to nonpayment of rent and that the locks were changed. The landlord also informed Signalshare that it intended to avail itself of all of its remedies under the lease.

  f. Winncomm Technologies served a demand on Signalshare seeking payment on a note, and threatening legal action. The total amount of the note is $837,589. M2 has stated that Signalshare intends to settle the matter.

  g. On February 19, 2016, Network Cabling sued Signalshare for $47,755 for failing to pay amounts due.

  h. On February 16, 2016, Signalshare and M2 Communications were served with a complaint filed in North Carolina by IT Hospitality Solutions, LLC, seeking damages for breach of contract.

  i. In February 2016, Brookville Special Purpose Fund, LLC, Veritas High Yield Find LLC and Allied International Fund, Inc. filed suits in New York against M2 and certain subsidiaries, seeking foreclosure on secured loans that were in default. M2 settled the cases in April 2016, by restructuring its business, and taking on new obligations, including increased interest in the event of a deficiency judgment.

36. M2 did not inform Cenfin of these claims, or in the case of the claims of CLC M2 did not inform Cenfin of the settlement payments. M2 is in breach of the Credit Agreement and the First and Second Amendments.

**Breach of Obligation to Restrict Payments and to Provide Notice of Payments and Contracts**

37. Section 5 of the Second Amendment bars M2 from allowing a payment to any creditor or lender of SSI without Cenfin's written consent.

38. This section also obligates M2 not to make any payment on its own behalf to any creditor, lender or funding source without providing two days' advance notice to Cenfin.

39. In addition, this section obligates M2 to provide Cenfin with copies of proposed agreements with lenders or creditors of M2

40. M2 breached these provisions by, among other things, making the payments described above and entering into the contracts described above without the knowledge of or notice to Cenfin.

41. M2 also breached this provision by paying certain creditors of SSI, including El Dorado Offices 2 and CLC Networks, without obtaining Cenfin's consent.

**Breach of Provision on Changing Name of Company**

42. Section 7(c) of the Stock Pledge Agreement directs that Roomlinx will not change its name without providing 30 days' notice to Cenfin. Roomlinx has recently changed its name to M2. This change was done without notice to Cenfin, in breach of the agreement.

**Damages**

43. Cenfin was damaged by M2's breaches of the Credit Agreement, First Amendment, Second Amendment, and Stock Pledge Agreement. This damage includes, but not is limited to, Cenfin not receiving payments that it was entitled to receive under its bargained-for agreements, Cenfin being denied information and agreements that Cenfin was entitled to receive that could have allowed it better to monitor and respond to the financial difficulties facing M2 and SSI; Cenfin losing the opportunity to control payments made on behalf of SSI, thus depleting the

assets available to pay the debt owed to Cenfin; and Cenfin having its debtor SSI fall into insolvency and eventual default on its obligations to Cenfin.

## Count III

44. Cenfin incorporates paragraphs 1-43 of this complaint as if fully stated herein.

45. In the Credit Agreement, First Amendment and Second Amendment represented to Cenfin that no litigation or claims were pending or threatened against M2 or SSI. Further, in the Credit Agreement, M2 and SSI represented that they were not in default under any agreement to which it is a party.

46. Both the First Amendment and Second Amendment were signed by Aaron Dobrinsky and Christopher Broderick, who were top executives and directors of M2.

47. M2 was under a duty to disclose to Cenfin accurate information concerning suits, claims and defaults, including a duty to update previous representations. This duty was imposed by the Credit Agreement and the First and Second Amendments. Further, M2 had a duty to inform Cenfin of the truth when it knew that Cenfin was operating under false information.

48. As discussed in paragraph 35 above, the representations that M2 provided were false. M2's 2015 10-K reveals that numerous lawsuits, claims, and defaults have been asserted against M2, SSI, and their affiliated companies. Moreover, M2 took action to settle claims, including making cash payments, without informing Cenfin.

49. These false representations were made intentionally and as part of a scheme to defraud. Since the closing of the reverse merger, M2 has been in poor financial condition. These false representations were provided as part of an effort by M2 to gain access to badly-needed cash

held by SSI. In addition, they were provided to induce Cenfin to delay taking steps to foreclose on the assets of SSI or otherwise interfere with M2's business.

50. M2 knew these representations were false. M2's executives Dobrinsky and Broderick had detailed, day-to-day knowledge of the Company and its situation. Indeed, in addition to signing the First and Second Amendments, Dobrinsky and Broderick signed the 2015 10-K that revealed the information on claims, lawsuits, and defaults that had previously been suppressed.

51. M2 intended that Cenfin would rely upon these representations, and Cenfin did in fact rely. M2 acknowledged this reliance in the Credit Agreement. In addition, Cenfin relied upon these representations by, among other things, authorizing transfers of cash to M2 from SSI, delaying foreclosure of SSI's assets, and not intervening to prevent payments using funds that contractually should have been provided to Cenfin.

52. Cenfin was damaged by the misrepresentations of M2. These damages include, but are not limited to, pecuniary losses resulting from delays in foreclosing on the assets of SSI, from transfers of cash from SSI to M2, and from Cenfin not being able to prevent payments using money that could have been directed to Cenfin.

WHEREFORE, the Cenfin, LLC requests that the Court enter judgment against the M2 nGage Group, Inc. ("M2"), f/k/a Roomlinx, Inc. for compensatory damages, punitive damages, continuing interest, costs and attorneys' fees, and such other relief as the Court finds to be just.

    Respectfully submitted,

    CENFIN, LLC


    By:   /s/ Peter J. Donoghue
        One of its attorneys

Peter J. Donoghue
Donoghue Law Firm, Ltd.
20 N. Clark Street
Suite 1600
Chicago, Illinois 60602
(312)380-6638
ARDC No. 6206849